### IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

BILL NELSON et al.,

      Plaintiffs,

v.                                        CASE NO.  4:07cv427-RH/WCS

HOWARD DEAN et al.,

      Defendants.

_____/

### ORDER GRANTING DEFENDANTS' MOTIONS <ins>TO DISMISS AND FOR SUMMARY JUDGMENT</ins>

      The issue is whether the Democratic national convention must seat Florida delegates chosen on the basis of a binding state primary conducted in open defiance of the national party's scheduling rules.  The answer is no.  The decision whether to adopt a schedule (at least if not wholly unreasonable) rests with the national party, not with a single state legislature or state party.  The decision whether to seat delegates chosen outside the approved schedule also rests with the national party, not with the defiant state legislature or state party.

**I**

## Background: The Underlying Facts

In each presidential election year, the Democratic Party of the United States selects its presidential nominee at a national convention. The convention is organized and run by an arm of the party's governing body, the Democratic National Committee ("DNC"). The DNC includes representatives from each state, including Florida, as well as representatives of national Democratic organizations.

The national convention makes decisions—including the nomination of a presidential candidate—by vote of delegates from the various states.[1] The DNC, through its Rules and Bylaws Committee, has adopted rules governing the delegate selection process. The rules leave each state party free, within limits, to determine the method by which delegates from that state will be selected.

Most states now select delegates based on presidential primaries (usually, but not always, conducted by state governments at state expense). A substantial minority select delegates through caucuses (conducted by state parties at state party expense). Under the national rules, any candidate who receives at least 15% of the vote in a primary must receive a proportional share of pledged delegates—that is, delegates who must initially vote at the convention in favor of a specific candidate.

---

[1] The convention also seats delegates from territories. For ease of reference, this order consistently refers only to states. The references are equally applicable to territories.

The rules also provide for unpledged delegates.  Caucus systems similarly allow both pledged and unpledged delegates.

The schedule of primaries and caucuses is an important and sometimes contentious issue.  In 1992, 1996, and 2000, the DNC delegate selection rules set the first Tuesday in March as the earliest permissible date for primaries or caucuses, with an exception for the Iowa caucuses and New Hampshire primary. All states complied with the rules.

For elections prior to 2000, the national Republican Party had no rules governing the scheduling of primaries or caucuses.  For 2000, the Republican Party set the earliest permissible primary or caucus date as the first Tuesday in February. As a result, in 2000 five states—including Michigan and South Carolina but not Nevada or Florida—held Republican primaries or caucuses in February with no corresponding Democratic event.  The five states held Democratic events later.

For 2004 the DNC moved its start date forward to correspond with the Republican schedule.  The new DNC delegate selection rules set the first Tuesday in February as the earliest permissible date for primaries or caucuses but maintained exceptions for Iowa (which could hold caucuses 15 days earlier) and New Hampshire (which could hold its primary seven days before other states). Eight states—including South Carolina but not Michigan, Nevada, or Florida—set

their primaries or caucuses on the first Tuesday in February.

Every state ultimately complied with the 2004 schedule.  Michigan had threatened, however, to set its primary on the same day as New Hampshire's. Michigan relented—agreeing to select delegates through caucuses conducted later—only when the national party agreed to create a commission to study the timing of presidential primaries and caucuses and to develop appropriate recommendations for the 2008 schedule.

The 2004 Democratic national convention adopted a resolution creating the study commission.  Chaired by United States Representative David Price of North Carolina and former United States Secretary of Labor Alexis M. Herman, the "Price-Herman commission" studied the timing issue at length, holding five meetings over ten months and hearing testimony from experts, state party leaders, elected officials, national organizations, and academics.  The commission issued its final report on December 10, 2005, recommending that the earliest permissible date for primaries and caucuses remain the first Tuesday in February, with exceptions not only for Iowa and New Hampshire but also for one or two additional primary states and one or two additional caucus states.  The commission included at least one member from Florida:  United States Representative Kendrick Meek.

Beginning in March 2006, the DNC Rules and Bylaws Committee invited

state Democratic parties to apply to be one of the states allowed to conduct primaries or caucuses prior to the "regular window" that would open on the first Tuesday in February.  Eleven state parties applied.  Florida did not.  The Rules and Bylaws Committee ultimately recommended adoption of the Price-Herman schedule and recommended that early primary or caucus authority be awarded only to Iowa, New Hampshire, Nevada, and South Carolina.

On August 19, 2006, the DNC adopted rules implementing the recommendation.  The voice vote was overwhelming, apparently with no dissents except from New Hampshire representatives.  No Florida member of the DNC spoke publicly or privately against the proposal.  So far as shown by this record, there was not a hint that anyone from Florida objected to the schedule.

The rules as adopted on that date include a four-tiered enforcement mechanism.  First, a state party selecting delegates in violation of the schedule (or in violation of certain other delegate selection rules not involved here) loses 50% of its pledged delegates, and certain of the state's unpledged delegates also lose their votes.  Second, the Rules and Bylaws Committee has authority to impose additional sanctions, including further delegate reductions (for a total reduction of up to 100% of the state's delegates).  Third, any presidential candidate who campaigns in a state that violates the schedule is not entitled to any pledged

delegates from the state.  But fourth, the Rules and Bylaws Committee may determine to impose no sanctions if it determines, based on clear and convincing evidence, that the state party, leaders, and elected officials took all steps and acted in good faith to achieve legislative changes to bring the state into compliance.

During the remainder of 2006 and during 2007, the DNC responded to a number of Democratic state legislative leaders and governors who were considering moving state primaries or caucuses to dates prior to those allowed by the rules.  In every instance the DNC said it would enforce the rules (and thus exclude delegates selected improperly).  And there were good grounds to believe the DNC would do so.  In repeated instances for more than 20 years, state parties from states that scheduled primaries earlier than DNC rules allowed had been required to hold caucuses in compliance with the DNC scheduling rules.  This occurred in 1984 in Vermont, in 1988 in South Dakota, and in 2000 in Arizona, Delaware, and Washington State.

In January, February, and March 2007, the Florida legislature considered moving the Florida presidential primary to January 29, 2008.  Representatives of the national Democratic and Republican parties made clear that if delegates were selected based on a primary conducted at that time, in violation of the national party rules, the state's delegations to the national conventions would be reduced, in

accordance with party rules.  The Democratic Party rules, as set forth above, mandated a reduction of at least 50% of pledged delegates, and allowed a 100% rejection of all delegates.  The Republican Party rules called for a delegate reduction of 50% or 90%—depending on whether the nonconforming date was adopted before or after the call to convention.

On March 21, 2007, the Republican-controlled Florida House of Representatives passed by vote of 115-1 a bill moving the Florida presidential primary to January 29, 2008.  The vote came after Democratic House members actively supported the measure, including in committee.  In response to the House action, the DNC wrote each Democratic United States Senator or Representative from Florida urging their opposition to the proposal.  So far as the DNC could determine, none was willing to raise any concern or try to intervene with state legislative leaders.

On April 27, 2007, the Republican-controlled Florida Senate passed a similar bill by vote of 37-2, again with extensive Democratic support.   The matter went back to the House, which passed the Senate version of the legislation by vote of 118-0.  The state's Republican Governor signed the bill into law on May 21, 2007.  The bill as adopted included other election-related provisions as well; the timing of the primary was not the only issue.

Even before final adoption of the bill, the DNC began discussions with the Florida Democratic Party about how to cope with the change in the primary date. Proposals included a party-run vote-by-mail process and party-run caucus system. The DNC offered to pay the entire cost of the caucus system.  This was unprecedented; each state party that held caucuses in 2000 in response to its legislature's adoption of a nonconforming primary date was required to bear its own expenses.

Ultimately, however, the Florida Democratic State Executive Committee ("FDSEC") determined to treat the January 29 primary as binding, in open defiance of the national rules.  On August 4, 2007, the FDSEC submitted its written plan, formally declaring its intention to proceed in this manner.  At a meeting on August 11, 2007, DNC officials apparently advised state party representatives that it was likely that if the state party continued on this course, it would lose all—not just part—of its national convention delegates.  The FDSEC did not relent.

On August 25, 2007, the DNC Rules and Bylaws Committee met to consider 32 state delegate selection plans, including Florida's.  The Committee heard extensive presentations by Florida state party officials.  After substantial deliberation, the Committee voted over a single dissent to strip Florida of all its

delegates.  The Committee says it acted "lest the nominating process descend into chaos, with each state free to leapfrog other states in a never-ending cycle." McNamara declaration (document 7-2) at 20.  The rules apparently would allow an appeal to the credentials committee and ultimately to the convention itself.

For the most part, the schedule has held.  Until very recently, only Florida had elected not to follow the rules.  After Florida set its primary for January 29, the DNC approved slight adjustments for Iowa (whose caucuses moved up to January 3), New Hampshire (whose primary moved up to January 8), and South Carolina (whose primary moved up to January 26).  Some 20 other states were set to proceed on February 5, 2008, the earliest date allowed by the DNC rules.

More recently, however, Michigan has joined Florida in refusing to follow the rules.  Michigan's Democratic Party has announced its intention to select delegates based on a January 15 primary.

## II
## Background: The Case at Bar

On October 4, 2007, this lawsuit was filed by Florida's Democratic United States Senator (Bill Nelson), one of Florida's Democratic members of the United States House of Representatives (Alcee L. Hastings), and another Florida citizen who is registered to vote as a Democrat (Janet B. Taylor).  Named as defendants

were the Democratic National Committee, its chair (Howard Dean), and the Florida

Secretary of State (Kurt S. Browning) in his official capacity.  On October 26,

2007, an amended complaint was filed adding as plaintiffs another Democratic

member of the United States House of Representatives (Corrine Brown) and four

other Florida citizens who are registered to vote as Democrats (Eugene A. Poole,

Sam Oser, Carlos de Zayas, and Luis Fernandez).

The amended complaint asserts that the exclusion of Florida's delegates

from the Democratic Party national convention will violate the equal protection

clause, will deny both substantive and procedural due process, and will violate

section 2 (not section 5) of the Voting Rights Act, 42 U.S.C. § 1973.  By its terms,

the amended complaint does not challenge the legislation that adopted the January

29 primary date and does not seek to block the election from going forward.

Plaintiffs filed no motion for a preliminary injunction.  On October 30, 2007,

defendants DNC and Dean moved for summary judgment, asserting that the

decision to exclude convention delegates selected in violation of the party's rules

does not constitute state action, that the decision thus is not subject to

constitutional or Voting Rights Act constraints, and that in any event the decision

fully complies with the Constitution and the Voting Rights Act.  On October 31,

2007, the defendant Secretary of State moved to dismiss, asserting that the

amended complaint challenged nothing he had done and sought no relief against him, and that the amended complaint is therefore barred by the Eleventh Amendment and in any event fails to state a claim on which relief may be granted. On November 5, 2007, plaintiffs moved for partial summary judgment, seeking a declaration that the proposed exclusion of delegates is unconstitutional or violates the Voting Rights Act, and asking the court to reserve for further proceedings the question of remedy.

All of the motions are fully briefed.  At oral argument on December 5, 2007, plaintiffs seemed to suggest, for the first time, that if the Constitution and Voting Rights Act do not require the national convention to seat the Florida delegates, then the statute moving the Florida primary to January 29 is unconstitutional or violates section 2 of the Voting Rights Act.  Plaintiffs specifically did not, however, ask for a ruling on this issue at this time.

Because of the urgency of the matter, I announced on the record at the conclusion of the hearing my intention to enter summary judgment in favor of defendants DNC and Dean and to dismiss the amended complaint as against the defendant Secretary of State, while granting plaintiffs leave to file a further amended complaint against the Secretary.  This order confirms—and provides a further description of the basis for—those rulings.  Section III of the order

addresses state action.  Section IV addresses plaintiffs' substantive constitutional

claims.  Section V addresses plaintiffs' procedural due process claim.  Section VI

addresses the Voting Rights Act.  Section VII addresses plaintiffs' claims against

the Secretary of State.

# III
# State Action

The Fourteenth Amendment's equal protection and due process clauses—the

provisions invoked by plaintiffs here—of course apply only to "state action," that

is, to acts that can be attributed in a relevant manner to a state or its political

subdivisions.  Section 2 of the Voting Rights Act applies to voting qualifications,

prerequisites, standards, practices, and procedures "imposed or applied by any

State or political subdivision."  42 U.S.C. § 1973(a).

Plaintiffs say the case at bar involves state action.  In one sense that is

plainly correct.  It was the State of Florida that adopted the January 29 primary

date, and it is the State of Florida that will conduct the primary.  But it is also true,

as the DNC and Dr. Dean insist, that the state had nothing to do with the adoption

of the DNC delegate selection rules or the decision not to seat delegates chosen in

violation of those rules.  Indeed, the DNC has vigorously resisted the state's

rescheduling of the primary and the state party's announced intention to use the

primary results as a basis for selecting delegates.  In that sense the DNC's

decisions have been the very antithesis of state action.

State action is a concept whose outer limits are less than clear.  The defense

suggestion that any part of the delegate selection process conducted without direct

state involvement is not state action proves too much.  Many years ago, when

parties ran white-only primaries without direct state involvement, the Supreme

Court held them unconstitutional, rejecting the assertion that the primaries

involved no state action.  *See Terry v. Adams*, 345 U.S. 461, 73 S. Ct. 809, 97 L.

Ed. 1152 (1953); *see also Smith v. Allwright*, 321 U.S. 649, 64 S. Ct. 757, 88 L.

Ed. 987 (1944); *Nixon v. Condon*, 286 U.S. 73, 52 S. Ct. 484, 76 L. Ed. 984

(1932).

Some courts have suggested more recently that these decisions should be

limited to their context—white primaries.  Thus, for example, the Eleventh Circuit

has said:

> In the earlier fifteenth amendment cases, involving white-only
> primaries or other disenfranchisement of blacks, the courts freely
> found the conduct of political parties and groups to constitute state
> action.  But recently, courts have hesitated to find state action when,
> as in this case, racial discrimination is not involved.

*Wymbs v. Republican State Executive Comm.*, 719 F.2d 1072 (11th Cir. 1983)

(footnote omitted) (citing *Cousins v. Wigoda*, 419 U.S. 477, 483 n.4, 95 S. Ct. 541,

42 L. Ed. 2d 595 (1975); *O'Brien v. Brown*, 409 U.S. 1, 4 & n.1, 92 S. Ct. 2718, 34 L. Ed. 2d 1 (1972); and *Ripon Soc'y, Inc. v. Nat'l Republican Party*, 525 F.2d 567, 574-76 (D.C. Cir. 1975)).

That explanation, however, is less than satisfactory.  Overt racial discrimination in elections is especially repugnant, but one does not ordinarily assess the repugnancy of the underlying conduct to determine whether it constitutes state action.  Instead, one ordinarily assesses whether the conduct constitutes state action before addressing the substantive issues.

Perhaps the white primary cases should be distinguished based on the implicit state approval of the explicitly-racist machinations the party pursued.  Or perhaps the cases should be seen simply as an instance of hard cases making bad law (or, perhaps more accurately, seemingly easy cases making law that will not be followed in less compelling circumstances).  Or perhaps one could conclude that the Fifteenth Amendment—with its specific focus on racial discrimination in voting—has a broader state action sweep than the Fourteenth.  *See* Note, *The Strange Career of "State Action" under the Fifteenth Amendment*, 74 Yale L.J. 1448 (1965).  But the white primary cases at least give some reason to question whether the state action concept is as narrow as the DNC and Dr. Dean would have it.

The issue need not be decided in the case at bar.  This is so because, as set forth ahead, defendants would be entitled to prevail even if it were held that the DNC delegate selection rules and the decision to exclude Florida delegates were sufficiently entwined with state-run primaries to constitute state action within the meaning of the Fourteenth Amendment.

## IV
## Substantive Constitutional Claims

The Constitution makes no mention of political parties, but they have a unique and protected stature in our constitutional system.  The First Amendment right to freedom of association extends to parties and protects their internal affairs from undue government interference.  Thus a political party ordinarily may decide for itself how delegates to its national convention will be chosen, and the party ordinarily need not comply with state laws purporting to restrict its options.  The United States Supreme Court has repeatedly so held.

Thus, for example, in *Cousins v. Wigoda*, 419 U.S. 477, 95 S. Ct. 541, 42 L. Ed. 2d 595 (1975), the national Democratic Party delegate selection rules conflicted with Illinois law, including on open access issues.  An Illinois court entered an injunction that prohibited the delegates who were selected in violation of Illinois law—that is, in compliance with the party rules—from participating in

the convention.  In affirming the injunction, an Illinois appellate court explicitly ruled that state law trumped the delegate selection rules.

The United States Supreme Court emphatically reversed.  The Court said that a national party and its adherents have a constitutionally protected right of association, that the right extends to the delegate selection process, and that a state may abridge the right only based on a compelling interest.  The Court rejected the state's claim that its laws were essential to protecting its citizens' voting rights: "Illinois' interest in protecting the integrity of its electoral process cannot be deemed compelling in the context of the selection of delegates to the National Party Convention."  419 U.S. at 491.  The Court said that allowing each of the 50 states to establish the qualifications of its delegates without regard to party policy would be "an obviously intolerable result."  419 U.S. at 490 (quoting *Wigoda v. Cousins*, 342 F. Supp. 82, 86 (N.D. Ill. 1972)).

In the case at bar, as in *Cousins*, the national party has a First Amendment right to adopt delegate selection rules and to exclude delegates chosen in violation of those rules.  Here, as in *Cousins*, the state's interest in its electoral process "cannot be deemed compelling in the context of the selection of delegates to the National Party Convention."  419 U.S. at 491.  And here, as in *Cousins*, allowing an individual state to countermand the national party's delegate selection policies

would be "an obviously intolerable result."  419 U.S. at 490.

Indeed, the national party's position is even stronger in the case at bar than in *Cousins*.  There the Illinois legislature adopted laws intended to open the delegate selection process.  That was a substantive difference in the treatment of Illinois voters, and standing alone it presumably would have had little if any adverse effect on the national party or other states.  In the case at bar, in contrast, the Florida legislature sought not to establish a more open process or to bring about any substantive change in delegate selection; the legislature sought simply to advance the date of the vote in order to give Florida a higher profile in comparison to other states.  Florida's interest in a different primary date is less compelling, and the potential adverse effect on the national party and other states greater, than the corresponding interests in *Cousins*.  In short, *Cousins* is fatal to plaintiffs' position in the case at bar.

The Supreme Court addressed another conflict between state law and national Democratic Party delegate selection rules in *Democratic Party of the United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 101 S. Ct. 1010, 67 L. Ed. 2d 82 (1981).  Under Wisconsin's "open primary" law, a voter could participate in a party primary without registering as a party member or otherwise publicly declaring a party preference.  Wisconsin law further required delegates to

a national convention to be pledged to vote in accordance with the primary results. The national Democratic Party's rules, however, provided that only voters who publicly declared their preference for the Democratic Party could participate in primaries or caucuses that were part of the delegate selection process.  The state attorney general brought an original action in the Wisconsin Supreme Court against the national party and the DNC asserting the primacy of state law over the delegate selection rules.  The Wisconsin court entered a declaratory judgment in the state's favor and said the national convention was required to seat the Wisconsin delegation even though selected in violation of the party's rules.

Again the United States Supreme Court emphatically reversed, reiterating its holding from *Cousins* that a national party's delegate selection rules are protected by the First Amendment right to freedom of association and thus can be overridden only based on a compelling interest.  Indeed, the Court said that in *Cousins*, "all nine Justices agreed that a State could not constitutionally compel a national political convention to seat delegates against its will."  *La Follette*, 450 U.S. at 126 n.31.  The Court said that Wisconsin's proclaimed interest in conducting an open primary did not extend to the separate question of whether the national convention was required to seat delegates pledged to vote on the basis of the primary results. On that issue, the party's rules took priority over the state's laws.

In the case at bar, as in *La Follette*, the state seeks to conduct a primary that does not comply with the national party's delegate selection rules.  Here, as there, the party intends to exclude delegates selected and pledged to vote at the convention on the basis of the nonconforming primary.  Here, as there, the state cannot "constitutionally compel a national political convention to seat delegates against its will."  *La Follette*, 450 U.S. at 126 n.31.  *La Follette*, like *Cousins*, is fatal to plaintiffs' position.

Other cases—in the Supreme Court, the Eleventh Circuit, and other circuits—have reached similar results.  *See, e.g., O'Brien v. Brown*, 409 U.S. 1, 92 S. Ct. 2718, 34 L. Ed. 2d 1 (1972) (staying injunction requiring Democratic convention to seat California delegation selected in winner-take-all primary as mandated by state law); *Wymbs v. Republican State Executive Comm.*, 719 F.2d 1072 (11th Cir. 1983) (noting a party's First Amendment right to control its own delegate selection process and reversing—on grounds of justiciability—an injunction requiring the Republican party to select Florida delegates based on a one-Republican-one-vote principle); *Bachur v. Democratic Nat'l Party*, 836 F.2d 837 (4th Cir. 1987) (rejecting challenge to party's gender allocation rule for delegates); *Ripon Soc., Inc. v. Nat'l Republican Party*, 525 F.2d 567 (D.C. Cir. 1975) (rejecting one-person-one-vote challenge to party's delegate allocation

formula).

These cases are controlling here notwithstanding three contrary assertions by plaintiffs.

First, plaintiffs say these cases involve core associational rights that are somehow more important than the rights at issue in the case at bar.  Thus, plaintiffs suggest, the Democratic Party's decision not to associate with delegates selected and pledged to vote at the convention based in part on votes cast in a Democratic primary by Republicans or other nonDemocrats—the issue in *La Follette*—is more important than choosing not to associate with delegates selected and pledged to vote at the convention based on primary votes of Democrats that were simply cast a week too soon.  The argument does not explain *Cousins* (or *O'Brien* or *Wymbs* or *Ripon*), in which the issue was the method by which admittedly qualified party members would select the state's delegates.  And more importantly, the constitutional right to freedom of association has never been conditioned on a legislature's determination of whether the right is being exercised wisely or unwisely.  To the contrary, the whole point of the right of association is that the holder of the right may choose to associate, or not to associate, with whom the holder pleases, for reasons the holder deems sufficient.  Thus the holder of the right—not a state legislature—is entitled to rank the holder's priorities and make

the relevant associational choices.  This was the principle at issue in *La Follette* (and *Cousins* and *O'Brien* and *Wymbs* and *Bachur* and *Ripon*), and it is the principle at issue here.  Moreover, to the extent it matters, the right to associate (or not to associate) with proposed national political convention delegates is very near the First Amendment association right's core.

Second, plaintiffs say the DNC has no compelling interest that would support excluding delegates chosen in the January 29 Florida primary.  But in trying to place the compelling interest burden on the DNC, plaintiffs have the governing standard exactly backwards.  As the Supreme Court squarely held in *Cousins* and *La Follette*, it is the *state* that must have a compelling interest in order to override the party's First Amendment right to seat delegates of its choice.  The *party* need not have a compelling interest in its rules.

Moreover, the DNC's interests in establishing a schedule for primaries and caucuses, and doing so well in advance, are compelling.  The length of the primary and caucus season makes a substantive difference.  Whether the primary and caucus season should start incrementally—first in smaller states that allow more personal and less expensive campaigning and only later in larger states where campaigning requires greater media buys—makes a substantive difference.  Whether the rules are set well in advance (as the DNC rules were) or can be altered

late in the process by individual states (as Florida seeks to do) makes a substantive

difference.  And whether there is a single schedule with which all states must

comply, or each state is free to make and alter the schedule for its own selfish

reasons, makes a substantive difference.

Plaintiffs have offered not a single argument—and none comes to mind—in

support of the notion that there can be no national schedule.  Plaintiffs have offered

not a single argument—and none comes to mind—in support of the notion that

each state must be free to do as it pleases.  A national party has a compelling

interest in setting a schedule and requiring compliance.  And the party has a First

Amendment right to exclude delegates selected in derogation of the schedule.

The third way in which plaintiffs attempt to deal with the principles

established by the many cases discussed above is this.  Plaintiffs say that even if

the DNC had the right to set the schedule and the Florida legislature had no right to

mandate a change, the DNC's proposed sanction—excluding all Florida

delegates—is too harsh.  Plaintiffs say that Florida's Democratic voters are being

disenfranchised.  The decisive answer is that the decision whether to exclude

nonconforming delegates rests with the party, not with the Florida legislature or

plaintiffs or this court.  This is the essence of the First Amendment right of

association recognized in *Cousins* and *La Follette* and *O'Brien* and *Wymbs* and

*Bachur* and *Ripon.*  Indeed, the square import of *La Follette* was that the

Democratic Party could properly exclude a state's entire delegation for failure to

comply with party rules.  That is what the DNC proposes to do here.

Moreover, the argument that this sanction is too harsh seems to presuppose

the existence of some lesser sanction or other approach that might bring about

compliance.  Pressed on the issue at oral argument, plaintiffs were unable to

suggest any alternative sanction or other approach that might accomplish that

result.  Indeed, even the sanction of excluding all delegates has proved insufficient.

First Florida and now, following Florida's lead, Michigan have refused to abide the

schedule, knowing full well the DNC's announced intention to exclude all of the

state's delegates.  The DNC's assertion that it needed to take decisive action "lest

the nominating process descend into chaos, with each state free to leapfrog other

states in a never-ending cycle," McNamara declaration (document 7-2) at 20,

hardly seems exaggerated.  With respect to the schedule—perhaps even more than

on other issues—the Supreme Court had it right when it labeled an every-state-for-

itself approach "an obviously intolerable result."  *Cousins*, 419 U.S. at 490.

In sum, the DNC had the right to establish a schedule for primaries and

caucuses used in the selection of delegates to its national convention.  And the

DNC has a First Amendment right of association to exclude delegates not chosen

in compliance with the schedule.

This does not mean, of course, that a party can do whatever it wishes with respect to delegate selection in general or the schedule in particular.  The white primary cases make clear that there are at least some limits with respect to delegate selection.  I assume without deciding that there are limits on a party's scheduling discretion.  But the discretion is surely broad—at least broad enough to cover any scheduling decision that is not wholly unreasonable.  The DNC's schedule easily passes muster.  Neither the State of Florida nor the Florida Democratic Party have a right to override the schedule.  And plaintiffs have no right to compel the DNC to seat nonconforming delegates.

# V
## Procedural Due Process

Plaintiffs assert that the DNC denied procedural due process in the adoption of its rules or the imposition of sanctions for Florida's noncompliance.  But even if the DNC's decisions could be deemed state action, they easily would survive procedural due process scrutiny.

In adopting provisions of general applicability, legislative bodies must  not deny equal protection or substantive due process, but legislative bodies ordinarily need not afford procedural due process.  Thus Congress or a state legislature need

not hold hearings prior to passing laws of general applicability, and they certainly need not provide notice and an opportunity to be heard to everyone who might be affected by a proposed law.  The DNC plainly was not constitutionally required to provide notice to the Florida legislature or Florida Democratic Party or individual state voters before setting the primary schedule and adopting the sanctions rule.

At most, therefore, any procedural due process obligation would have extended only to the application of the rule to the Florida delegation—that is, to the determination that the delegates' selection would indeed violate the scheduling rule, and to the determination to exclude all, not just half, of the delegates.

The definitive answer to the procedural due process attack on these decisions is that the DNC Rules and Bylaws Committee afforded state party officials a full and fair hearing before voting to enforce the rules and to exclude Florida's entire delegation.  Procedural due process—if applicable at all—required nothing more.

## VI
## The Voting Rights Act

Plaintiffs assert that the DNC's exclusion of Florida delegates will violate section 2 of the Voting Rights Act.  Congress adopted the Act to remedy racial discrimination in voting.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S. Ct. 803, 5 L. Ed. 2d 769 (1966).  Section 2 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied *by any State or political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color* [or *membership in a language minority group*].

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election *in the State or political subdivision* are not equally open to participation by members of a class of citizens protection by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .

42 U.S.C. § 1973 (emphasis added).

It seems unlikely that either the DNC delegate selection rules or the DNC's decisions whether to seat or exclude delegates are subject to the Act at all.  *Cf. LaRouche v. Fowler*, 77 F. Supp. 2d 80 (D.D.C. 1999) (three-judge court) (holding that national party's internal rules need not be precleared under Voting Rights Act § 5).  And if the Act applied at all, it of course would be constrained by the party's First Amendment association rights.

But the applicability of the Act need not be decided here, because the DNC has not violated the Act, even if applicable.  Nothing in this record suggests that the DNC's approved schedule was intended to have, or in fact has had, any adverse effect on members of any race or language minority group.  Nothing in this record

suggests that the DNC's decision to seat delegates from the other states and territories, while excluding delegates from Florida (or from both Florida and Michigan), was intended to have, or in fact has had, any adverse effect on members of any race or language minority group.  To the contrary, the DNC has treated all Florida Democrats exactly alike, regardless of race or language.  And while the universe of binding-primary voters from all states combined will have shrunk, and the universe of delegates from all states combined will have shrunk, nothing in this record suggests that the racial and language-minority representation within those shrunken universes will be different from their representation within the larger universes inclusive of Florida voters and delegates.

Plaintiffs have not asserted the contrary.  Instead, they say a higher percentage of Florida African-American voters are Democrats than Republicans, so that the DNC's decision to exclude all delegates, compared to the Republican Party's decision to exclude only a percentage of Florida delegates, works a racial inequality.  Nothing in the Voting Rights Act, however, requires the Democratic Party to match its rules with those of the Republican Party, just because the parties have different percentages of African-American voters.  The Act requires a covered entity—for example, a state—not to discriminate among its own voters based on race or language minority, but the Act does not require one entity (for

example, Georgia) to conform its rules to those of another entity (for example,

Alabama).  And this is true even if the two entities have different percentages of

African-American or language-minority voters.  Thus even if the national

Democratic Party is a covered entity—not at all obvious—this means only that it

must not discriminate among its own voters, not that it must treat its voters the

same as the Republican Party treats Republican voters.

Plaintiffs have not established a violation of Voting Rights Act § 2.

## VII
## Claims Against the Secretary of State

Finally, plaintiffs have named as a defendant the Florida Secretary of State

in his official capacity.  The Secretary has moved to dismiss, correctly noting that

the amended complaint challenges nothing the Secretary has done and seeks no

relief against him.  Plaintiffs say vaguely that his presence might be necessary for

unspecified relief in the future, but a complaint cannot properly go forward on the

ground that in the future additional allegations might be made that might afford a

basis for relief.  The Secretary's motion to dismiss thus will be granted.

To be sure, plaintiffs hinted at oral argument that if their constitutional and

Voting Rights Act challenges to the DNC's exclusion of Florida delegates was

rejected—as has now occurred—plaintiffs might assert that the change of the

primary date itself was unconstitutional or violated the Voting Rights Act. Plaintiffs carefully did not, however, actually assert that claim.  The claim will not be addressed unless and until actually presented.  Leave to amend will be granted. The granting of leave ought not, however, be read as a suggestion that claims of this type would, or would not, have merit.

## VIII
## Conclusion

The Democratic National Committee was entitled to adopt a schedule for 2008 primaries and caucuses used in the national convention delegate selection process.  The DNC acted within its First Amendment association rights when it determined to exclude Florida delegates chosen in violation of the party's schedule. Neither the schedule nor the exclusion of delegates violate the Constitution or the Voting Rights Act.  For these reasons,

IT IS ORDERED:

1.  The summary judgment motion of defendants Howard Dean and the Democratic National Committee (document 6) is GRANTED.  I hereby expressly determine that there is no just reason for delay and expressly direct the clerk to enter judgment stating, "Pursuant to Federal Rule of Civil Procedure 54(b), all claims asserted in the amended complaint against defendants Howard Dean and the

Democratic National Committee are dismissed with prejudice."

      2.  Defendant Secretary of State Kurt S. Browning's motion to dismiss (document 9) is GRANTED.  I do *not* direct entry of judgment with respect to the claims against the Secretary of State.

      3.  Plaintiffs' motion for partial summary judgment (document 10) is DENIED.

      4.  Plaintiffs are granted leave to file a second amended complaint not inconsistent with this order by December 21, 2007.  If a second amended complaint is not filed by that time, final judgment will be entered dismissing all remaining claims with prejudice.

      SO ORDERED this 14th day of December, 2007.

                    s/Robert L. Hinkle
                    Chief United States District Judge